**Isabella S. COX, the natural mother of Christopher C. Mistretta, Petitioner**

v.

**SECRETARY OF The DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 90–907V.

United States Court of Federal Claims.

Nov. 8, 1993.

Dominic E. Amadio, St. Petersburg, FL, attorney of record, for petitioner.

Tarek Sawi, Washington, DC, with whom was Asst. Atty. Gen. Frank W. Hunger, for respondent.

## OPINION

REGINALD W. GIBSON, Judge:

Petitioner filed a motion for review of the special master's May 27, 1993 decision in the

United States Court of Federal Claims [1] under the National Vaccine Injury Compensation Program (Vaccine Act or Act) [2].

The special master denied the claim for compensation, without holding a hearing, on the basis that petitioner's documentary evidence failed to establish a Table residual seizure disorder as defined by the Act's Injury Table.[3] Petitioner now seeks review of that decision pursuant to a timely filed motion (June 24, 1993) under 42 U.S.C. § 300aa–12(e)(1). That motion for review raises four assignments of error as follows: [4]

1. The special master abused his discretion by striking from the record the medical opinion of petitioner's expert, concluding that the expert's testimony was not credible;

2. The special master arbitrarily and capriciously misread and misinterpreted certain medical records and accorded them dispositive weight;

3. The special master abused his discretion by denying petitioner a hearing in the matter; and

4. The special master considered irrelevant factors in his decision. The foregoing issues will be addressed, *infra,* seriatim.

After reviewing the record evidence and related briefs, and being fully advised in the premises, the court sustains the special master's decision denying compensation.

## I. FACTS

Christopher Mistretta ("Chris") was born on August 3, 1969. He received three DPT immunizations within six months of birth without any apparent reaction.[5] Chris suffered his first seizure nearly ten months later, on or about May 27, 1970. He was taken to the hospital emergency room and was diagnosed with a 30–minute febrile convulsion. After the seizure, Dr. Thomas White, Chris's family doctor, administered an EEG test, which revealed no abnormalities.

Eight months after the foregoing seizure, on January 22, 1971, Chris received his first DPT booster from Dr. White with no immediate reaction. Three days later, on January 25, Chris began vomiting and visited Dr. White in his office. Following thereon, at 7:00 p.m. that same evening, Chris suffered a convulsion accompanied by a temperature of 103.2 degrees Fahrenheit and was taken to Palms of Pasadena Hospital emergency room. Fever and vomiting continued until he developed pneumonia on February 5, 1971.

Chris suffered another febrile convulsion on March 11, 1971, and was taken to the Bayfront Medical Center emergency room. The hospital's record admission notes indicate that his mother advised that Chris had convulsions that day with a temperature of 104 degrees Fahrenheit. However, upon admission, the record indicates that he had a rectal temperature of 101.8 degrees Fahrenheit. Later, on August 31, 1971, Chris was

---

1. The predecessor United States Claims Court was renamed the United States Court of Federal Claims pursuant to the enactment of the Court of Federal Claims Technical and Procedural Improvements Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506 (1992).

2. Tit. XXI, § 2112, as added Nov. 14, 1986, Pub.L. No. 99–660, tit. III, § 311(a), 100 Stat. 3761; and amended Dec. 22, 1987, Pub.L. No. 100–203, tit. IV, §§ 4303(d)(2)(A), 4307(3), 101 Stat. 1330–222, 1330–224, Pub.L. No. 100–203, tit. IV, §§ 4307(3)(C), 4308, as amended and added July 1, 1988, Pub.L. No. 100–360, tit. IV, § 411(*o*)(2), (3)(A), 102 Stat. 808; Dec. 19, 1989, Pub.L. No. 101–239, tit. IV, § 6601(d)–(i), 103 Stat. 2286–2290; Nov. 3, 1990, Pub.L. No. 101–502, § 5(b), 104 Stat. 1286; Nov. 26, 1991, Pub.L. No. 102–168, tit. II, § 201, 105 Stat. 1102; Oct. 27, 1992, Pub.L. No. 102–531, tit. III, § 314, 106 Stat. 3508.

3. 42 U.S.C. § 300aa–14(a), (b)(2).

4. Vaccine Rule 24 requires petitioner to file a memorandum of objections with its motion for review wherein:

> . . . [the] memorandum must fully and specifically state and support each objection to the decision. The memorandum shall cite specifically to the record created by the special master . . . and should also fully set forth any legal argument the party desires to present to the reviewing judge.

RCFC, App. J, Rule 24.

5. The first three vaccinations occurred on October 2, 1969, November 18, 1969, and January 2, 1970.

admitted to the All Children's Hospital where he stayed until discharged on September 3, 1971. Petitioner stated in her affidavit that Chris had five convulsions beginning "the previous night and continuing on until hospitalized." The medical report diagnosed said condition as "febrile convulsion."

## II. BACKGROUND DATA

From the filing of the petition (September 1990) to the briefing of the motion for review (June 1993), this case spanned more than two and one-half years. During that span, it generated seven status conferences, 19 orders, and a motion to strike the opinion of a medical expert convicted of a felony. Five months after the petition was filed, on February 13, 1991, petitioner filed the medical opinion of her expert, Dr. Roger Morrell. Respondent followed by filing its Rule 4(b) report on May 31, 1991, in which it averred that petitioner failed for two reasons to establish a Table residual seizure disorder. First, it argued that Chris's *first* seizure occurred *more than 72 hours (i.e.,* three days) *after vaccination,* and, secondly, that a fever of at least 102 degrees Fahrenheit *accompanied all subsequent seizures.*[6]

At the very first status conference, on June 27, 1991, the special master ordered petitioner to supplement Dr. Morrell's February 13, 1991 medical report to include the complete factual basis for his conclusions. The order was prompted by what the special master perceived to be a significant discrepancy between the probative substantive content of the medical records and Dr. Morrell's conclusions. The order also required respondent to file the medical report of its expert.

Petitioner filed her supplemental report on July 22, 1991. Respondent filed the opinion of its expert, Dr. Richard Gilmartin, on August 29, 1991. After a second status conference, held on September 13, 1991, the special master issued a second, more specific order, requiring petitioner to file another supplemental report identifying the operative facts relied on by Dr. Morrell to reach his conclusion that Chris suffered *two afebrile* seizures within a year after his January 22, 1971 DPT booster.

On September 30, 1991, Petitioner filed her second supplemental report in the form of two letters from Dr. Morrell. Dissatisfied with the factual support offered in the two letters, the special master held another status conference on October 23, 1991.[7] The order that followed, dated October 28, 1991, granted petitioner a final opportunity to clarify the basis of Dr. Morrell's medical opinion.[8]

The response filed by petitioner on November 1, 1991, also failed to include, as requested, an account of the specific factual basis for Dr. Morrell's opinion. Instead, petitioner's counsel himself merely regurgitated the factual arguments.[9]

---

6. 42 U.S.C. § 300aa-14(b)(2).

7. The chief special master recalls in his decision that even after the two orders "Dr. Morrell provides no record citation or other factual basis for his opinion regarding the probability of the first afebrile seizure." Chief Special Master's Decision, page 3.

8. The order stated in pertinent part as follows: Petitioner is forewarned that petitioner's expert has had several opportunities to state the basis for his opinion. Rather than illuminating, the expert's opinions have gotten progressively more confusing. Thus, petitioner's counsel is strongly advised to discuss this case with the expert so that his *last* clarifying statement clearly identifies the facts relied upon, the injury alleged and the basis for the opinion. . . .
Chief Special Master's decision, page 3.

9. Petitioner's counsel responded to the October 28, 1991 order by personal letter stating in part:

The facts are that on 1/22/71 Christopher received his fourth DPT injection. On 1/25/71 (within the statutory framework) he began vomiting and developed gastroenteritis. Another seizure occurred on 3/11/71 when the child was nineteen months of age and on August 31, 1971 the child had his third seizure. Therefore, *it* is *my* opinion that Christopher Mistretta does fall within the Vaccine Injury Table guidelines.
As a result of the DPT injection, Christopher C. Mistretta is characterized by seizures, progressive alterations in mental status, and other signs of cerebral involvment [*sic*]. In addition, Chris exhibits progressive encephalopathy.
My opinion is corroborated by the Physician's Desk Reference 1990, page 878 . . .
(Petitioner's November 1, 1991 letter, attached to petitioner's November 18, 1991 Motion For Leave To File Out Of Time).

In view of such, the special master averred in his dispositive decision that "[p]etitioner did *not* file a statement from its expert but instead counsel argued the facts." However, *in petitioner's motion for review, counsel* insisted that he fully complied with the October 28, 1991 order inasmuch as said order required *only* that the "petitioner [and not the expert] shall file ... a statement clarifying the evidence relied upon by the medical expert."

Another status conference was held on December 12, 1991, at which time the special master granted petitioner until February 14, 1992, *to submit a "report of a new medical expert."* At this posture in the proceedings, Dr. Morrell had been convicted (on August 8, 1991) on numerous counts of defrauding the government and, as a consequence, was later sentenced to six years imprisonment.[10]

When petitioner was unable to procure the medical report of another expert within the time allowed, the special master granted two further extensions. Finally, on July 31, 1992, petitioner requested that the matter be set for a hearing, indicating that after exhaustive efforts she was unable to obtain additional medical reports, and would rely entirely on the medical records and testimony of Dr. Morrell.

Meanwhile, on July 15, 1992, respondent filed a motion to strike Dr. Morrell's testimony, which remained unopposed by petitioner. On August 26, 1992, the special master issued an order striking Dr. Morrell's testimony. The order stated that Dr. Morrell's testimony was entitled to "little or no weight" because his letter opinion was based on unsupported facts and assumptions, and for the further reason that his criminal convictions undermined his credibility.

With Dr. Morrell's legal problems preventing him from presenting oral testimony, the special master dispensed with a hearing and ordered a briefing schedule. His decision issued on May 23, 1993.

## III. DISCUSSION

### A. Standard of Review

The United States Court of Federal Claims reviews vaccine cases under the arbitrary and capricious standard. When a party files a motion for review pursuant to 42 U.S.C. § 300aa–12(e), the court, after examining the record, may, pursuant to § 12(e)(2)—

(A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision;

(B) set aside any findings of fact or conclusions of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law; or

(C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa–12(e)(2). Vaccine Rule 27 articulates the same standard.[11]

Adherence to the foregoing standard of review, outlined in both the Act and the rules, compels the court to accord *substantial deference* to the special master's decision.[12] That is to say, we may not reverse

---

10. Because of said conviction, respondent filed its motion to strike testimony of Dr. Roger Morrell. Respondent submitted, in support of its motion, the declaration of Wayne F. Pratt, the Assistant United States Attorney who prosecuted Dr. Morrell for participating in a conspiracy designed to illegally distribute prescription drug controlled substances to "patients." *See* Respondent's Motion To Strike Testimony of Dr. Roger Morrell, filed July 15, 1992, to which is attached the November 19, 1991 Declaration of Mr. Pratt, Assistant United States Attorney.

11. RCFC, App. J, Rule 27.

12. In 1989, Congress amended the Act to reflect the more deferential standard of review to be applied to special master's decisions by the Court of Federal Claims. This was done because the standard before the 1989 amendments arguably created difficulties for the court. The court in *Stotts v. Sec'y DHHS*, 23 Cl.Ct. 352 (1991), explained the problems that arose as follows:

On the one hand, the special master was *not* bound by the traditional rules of evidence in developing proposed findings of fact and conclusions of law, while the Claims Court was, on the other hand, statutorily obligated to apply those rules in a *de novo* review of the decision below. Not surprisingly, this resulted in serious evidentiary problems and proof problems in the Claims Court, and understandably, generated the undesirable effect of pro-

simply because we disagree with the special master's rationally-based findings of fact. Instead, the court must narrow its focus to determine whether the special master's findings of fact or conclusions of law are arbitrary and capricious, an abuse of discretion, or contrary to law. *Stotts,* 23 Cl.Ct. at 360 (citing *Hines v. Sec'y DHHS,* 21 Cl.Ct. 634, 639 (1990)).

While no single expression of the arbitrary and capricious standard governs our review, the assortment of definitions compiled by the court in *Hines v. Sec'y DHHS,* 940 F.2d 1518, 1527–28 (Fed.Cir.1991), *supra,* instructs our analysis:

> "[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 43 [103 S.Ct. 2856, 2867, 77 L.Ed.2d 443] (1983) (review of agency rulemaking); agency must articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choices made," *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156 [83 S.Ct. 239, 9 L.Ed.2d 207] (1962) (review of agency adjudication); "proof that there was 'no reasonable basis' for the administrative decision will also suffice [to show arbitrary and capricious conduct], at least in many situations," *Prineville Sawmill Co., Inc. v. United States,* 859 F.2d 905, 913 (Fed.Cir. 1988) (quoting *Keco Ind., Inc. v. United States,* 492 F.2d 1200, 1203–04, 203 Ct.Cl. 566 (1974)) (review of pre-award bid protest action against letting of government contract); reviewing court must "guard against an agency's drawing inferences that are 'arbitrary' in relation to the facts found, no matter how substantial may be the support for those facts," *Midtec Paper Corp. v. United States,* 857 F.2d 1487, 1498 (D.C.Cir.1988) (review of agency adjudication); "the central focus of the arbitrary and capricious standard is on the rationality of the agency's 'decisionmaking,' rather than its actual decision," *United States v. Garner,* 767 F.2d 104, 116 (5th Cir.1985); "whether the decision was based on a consideration of relevant factors, whether there has been a clear error of judgment and whether there is a rational basis for the conclusions . . . . ," *Mobil Oil Corp. v. Department of Energy,* 610 F.2d 796, 801 (Temp.Emer.Ct.App.1979), *cert. denied,* 446 U.S. 937 [100 S.Ct. 2156, 64 L.Ed.2d 790] (1980) (review of agency rulemaking) (quoting *Texaco, Inc. v. Federal Energy Admin.,* 531 F.2d 1071, 1076–77 (Temp.Emer.Ct.App.1976)).

*Hines,* 940 F.2d at 1527–28.

■ Each standard articulated in 42 U.S.C. § 300aa–12(e)(2)(B) applies to a different aspect of the special master's decision. The court evaluates findings of fact under the "arbitrary and capricious standard"; legal conclusions under the "not in accordance with the law standard"; and discretionary rulings under the "abuse of discretion standard." *See Munn v. Sec'y DHHS,* 970 F.2d 863, 870 (Fed.Cir.1992). Against this background, we proceed to address petitioner's assignments of error under the learned-eye of the foregoing precedent.

### B. Issue (1)

■ The first issue asks whether the special master abused his discretion by issuing the August 26, 1992 order striking the "affi-

---

longing and complicating vaccine litigation, a consequence diametrically at odds with the legislative goals of Congress. Therefore, Congress attempted to correct these and other deficiencies with certain technical amendments. . . . [A]n objection by either party will trigger review jurisdiction in the Claims Court, but that review is now strictly limited to the record developed before the special master. The findings of fact and conclusions of law may be rejected by the . . . Court [of Federal Claims], but now only if they are arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.

*Id.* at 358–59.

davit" (medical report) of Dr. Morrell.[13] The court finds that the special master indeed committed error by striking Dr. Morrell's medical report. The issue is not one of admissibility, to the extent the report is relevant, but rather is simply a question of what weight the fact finder will attribute. The special master should have allowed the medical report to remain on the record and should have considered it for whatever weight it deserved. After performing such an evaluation itself, this court is satisfied that, while relevant, Dr. Morrell's medical report deserves little or no weight in light of the entire record. For this reason, the court finds that, while the special master abused his discretion by striking Dr. Morrell's "affidavit" from the record, it was harmless error to do so. In addition, by failing to file an opposition to respondent's motion to strike, petitioner tacitly consented to the special master's August 26, 1992 order granting the motion.

 Respondent moved to strike Dr. Morrell's testimony because it alleged that the opinion contained therein was vague, contained unsupported assumptions, and was unsupported by petitioner's medical records or affidavit. Respondent also argued that Dr. Morrell's fraud conviction undermined his credibility. Petitioner failed to submit an opposition to respondent's motion to strike.

After examining each of Dr. Morrell's letters, the court determines that they are all relevant to petitioner's case. Rule 401 of the Federal Rules of Evidence defines relevant evidence as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The medical expertise of Dr. Morrell is not in question. Dr. Morrell graduated from George Washington University School of Medicine and holds a graduate degree from the University of Miami in Cellular and Molecular Biology. He based, to some extent, his conclusions on Chris's medical records and interviews with Chris and petitioner, his mother. There is nothing facially objectionable in the theory of his opinion that the DPT vaccinations Chris received *before* his January 22, 1971 booster sensitized Chris toward seizure tendency, or that the final booster triggered the injurious condition Chris suffers from today. He also cited family medical history in support of his theory. While Dr. Morrell's reliance on the medical records in this case may have been less rigorous than petitioner had hoped, his conclusions are not, *ipso facto*, void of probative value. While the special master exerts considerable control over the management and disposition of a petition for compensation and, as the threshold fact finder, weighs the evidence and evaluates the credibility and

---

13. After a thorough review of the record, the court determines that petitioner filed four documents prepared by her expert, Dr. Morrell. The first is a letter from Dr. Morrell (dated January 27, 1991, and filed February 13, 1991) presenting his medical opinion as to Chris's condition. While Dr. Morrell titled his letter an "affidavit," it was not notarized or made under oath. The second document is a letter prepared by Dr. Morrell in order to supplement, at the court's request, his January 27 letter (dated July 15, 1991, and filed July 22, 1991). The third and fourth documents were filed together on September 30, 1991, in response to the court's second demand for a supplement to Dr. Morrell's January 27 letter opinion. These final two documents were prepared on September 12, 1991, and September 26, 1991, respectively. Before the August 26, 1992 order granting respondent's motion to strike, all of Dr. Morrell's letters were part of the record. Respondent, however, identified the object of its motion to strike only as "Dr. Morrell's affidavit." (Respondent's Motion To Strike Testimony of Dr. Morrell, filed July 15, 1992). Respondent may have been referring to Dr. Morrell's self-titled, but inaccurately characterized, "affidavit" filed on January 27, 1991. (Respondent's Motion To Strike Testimony of Dr. Morrell, filed July 15, 1992). In its motion, however, respondent claims that this "affidavit" was filed in September of 1991. Of the four documents submitted by petitioner on behalf of Dr. Morrell, only the last two were filed in September. Neither of those documents, however, is an affidavit. The special master further compounded the confusion when he failed to specify which document(s) he in fact struck pursuant to his August 26, 1992 order. While the special master refers in the order to "Dr. Morrell's letter opinion," the general subject of the order is the "testimony of Dr. Morrell." (Special Master's Order dated August 26, 1992). The lack of precision in respondent's motion and the special master's order forces the court to sweep broadly and find that admissibility of all four documents was before the special master. The court also finds that because he used the term "Dr. Morrell's testimony" in describing what was struck, the special master struck all four documents before him.

reliability of all substantive submissions,[14] he must also ensure that each party has a full and fair opportunity to present its case and create a record sufficient to allow review of the special master's decision. RCFC App. J, Rule 3.[15] To this extent, while not bound by common law or statutory rules of evidence, basic principles of fundamental fairness to the parties must, nevertheless, govern the review of evidence. RCFC App. J, Rule 8(b).

In any fact-intensive case, fundamental fairness requires this court to draw a sharp distinction between weighing and excluding evidence. In light of the relaxed standards for admissibility, 42 U.S.C. § 300aa–12(d)(2), the special master should allow evidence to enter the record even if its probative value is limited. Fed.R.Evid. 402. Unless a submission severely prejudices the opposing party, or is entirely irrelevant, it should be considered by the special master and attributed appropriate weight.[16] Fed. R.Evid. 403. The special master did not discuss prejudice or relevance in his order granting respondent's motion to strike. Issues of credibility and probative value are critical issues affecting weight and not admissibility. We, therefore, find that he abused his discretion because the factual basis upon which the motion was premised, and the expert's criminal background, raised issues of weight and not of admissibility.

The exclusion of Dr. Morrell's medical report from the record, however, is harmless error. This we are constrained to conclude because, even after consideration of all four medical reports, on balance, the greater weight of the evidence remains adverse to petitioner's position. *Manley v. Sec'y DHHS,* 18 Cl.Ct. 799, 802 n. 4 (1989) (finding that even if the court is wrong in holding that the special master properly excluded evidence as hearsay, such exclusion would be harmless error because the evidence was untested by cross-examination or other assurances of credibility and, therefore, entitled to little weight); *Kue v. Sec'y DHHS,* 18 Cl.Ct. 777, 778 n. 2 (1989) (stating that notwithstanding the court's finding that respondent's medical report was inadmissible hearsay, the special master's failure to exclude that report was harmless error since it was cumulative). Furthermore, petitioner waived any opposition argument when she failed to submit a response to respondent's motion to strike. RCFC App. J, Rule 8(f).

Dr. Morrell prepared his medical reports more than *20 years after* Chris experienced his first seizure. Therefore, it is evident that petitioner's expert had no *personal* knowledge of Chris's seizures. His opinion can, at most, be based on medical records made available to him and his interviews with Chris and his mother. To the extent that Dr. Morrell cannot ground his conclusions in the facts provided to him, the reliability of his testimony must, of course, be questioned.[17] In his written testimony, Dr. Mor-

---

14. The rules charge the special master with determining the format of the proceedings, requiring such evidence as may be appropriate, and weighing the credibility and reliability of the evidence submitted. *See* 42 U.S.C. § 300aa–12(d)(2), 12(d)(3)(B); RCFC, App. J, Rules 3–8.

15. Vaccine Rule 3 provides in relevant part as follows:

(b) Duties....
The special master shall determine the nature of the proceedings, with the goal of making the proceedings expeditious, flexible, and less adversarial, while at the same time affording each party a full and fair opportunity to present its case and creating a record sufficient to allow review of the special master's decision.

16. Striking the medical report from the record in vaccine cases can be especially harsh on petitioners. Under 42 U.S.C. § 300aa–13(a)(1), the peti-

tioner must substantiate its claim by medical records or by medical opinion. Striking the medical expert opinion forces the petitioner to rely entirely on its medical records to meet its burden of persuasion.

17. In vaccine proceedings, expert testimony and medical records are, generally, critical components of a petitioner's case. In fact, the Act so contemplates. These two bases of proof, along with petitioner's affidavit, must, therefore, establish the following:

(1) Chris did not suffer an afebrile seizure before the January 22, 1971 DPT vaccination (42 U.S.C. § 300aa–14(b));
(2) Chris suffered a seizure within 72 hours of his January 22, 1971 DPT vaccination (42 U.S.C. § 300aa–14(a)); and
(3) Chris suffered two afebrile seizures within one year of the January 22, 1971 DPT vaccination (42 U.S.C. § 300aa–14(b)(2)).

rell asserts that Chris suffered a seizure within 72 hours of the January 22, 1971 DPT booster without directing the court's attention to facts in the record, or anywhere else, that promote such a conclusion. Dr. Morrell's January 27, 1991 letter opinion, for example, states that "[a]fter the booster (lot # not certain) he had a fever to 103 degrees Fahrenheit, screamed, was inconsolable, and on 1–25–71 had a seizure (adequately described). This was followed by another seizure within hours." (Letter from Dr. Morrell to petitioner dated January 27, 1991). The medical records and petitioner's affidavit, however, indicate that only one seizure occurred at about 7 p.m. on January 25. (Original Petition, Exhibit 10, page 84; Exhibit 6f, page 76).

Dr. Morrell also asserts that Chris suffered two afebrile seizures within one year of his January booster. In his July 15, 1991 letter, he states that:

> On 1–25–71, after vomiting was noted in the morning, his body became rigid, lips blue, mouth foamed, eyes rolled, followed by jerking without incontinence. Returning home from the ER about 10:00 p.m., and presumably with fever reduced, another seizure occurred within hours. It was probably *not* a febrile seizure.

Dr. Morrell provides no reference to medical records to support his assertion. Petitioner's affidavit, filed with the original petition on September 10, 1990, makes no mention of a late-night seizure on January 25.[18] Dr. White's notes from the next day mention one January 25 convulsion, but with a temperature of 103.2 degrees Fahrenheit.[19]

In support of the second statutorily-required afebrile seizure, Dr. Morrell states in his September 26, 1991 letter that "[t]he second of several other seizures which are known to have occurred at a body temperature of less than 102 degrees Fahrenheit occurred 8/31/70 (MR–pp. 90–91). During that episode his temperature reached 102 degrees Fahrenheit but did not exceed it." (Letter from Dr. Morrell to petitioner dated July 15, 1991). Chris's hospital records do not indicate a seizure on that date. The records do refer to a series of seizures occurring one year later, on August 31, 1971, at All Children's Hospital. None of these seizures, however, were accompanied by a fever of less than 102 degrees Fahrenheit. (Original Petition, Exhibit 14a, pages 90–91).

After careful review of the record, the court is satisfied that Dr. Morrell has not provided sufficient support for his medical opinion. The court, therefore, attributes little or no weight. We need not consider the impact of the criminal conviction on Dr. Morrell's report. The probative value of the report is meager on its own terms, and will be given little weight, regardless of whether Dr. Morrell was convicted.

### C. Issue (2)

■ The second issue inquires whether the special master arbitrarily misread and misinterpreted petitioner's medical records. After a close review of the medical records, the court rejects petitioner's second assignment of error. While this court finds that the special master committed error in reading and interpreting certain of petitioner's medical records, the error was harmless because, even under an error-free review, petitioner's evidence still falls short of establishing residual seizure disorder.

■ In order to establish a prima facie claim for compensation for residual seizure

18. Petitioner's affidavit provides in relevant part as follows:

> [O]n January 25, 1971, three days after receiving the vaccine, Christopher started vomiting and was taken to see Dr. White.... Christopher was given a prescription for the vomiting and sent home. At 7 p.m. on this same day (1–25–71), Christopher ran a temperature of 103.2 degrees. Christopher had a convulsion lasting a few minutes. I took him to the Emergency Room of Palms of Pasadena Hospital.... Diagnosis was febrile convulsion. On January 26, 1971, Christopher was still vomiting and had diarrhea. On January 27, 1971, Christopher had stopped vomiting, but his temperature was still holding on.

19. Even if the seizure reflected in Dr. White's January 26, 1971 notes indeed refers to a second, late-night seizure, after Chris returned home from the hospital, the fact that it was accompanied by a 103.2 degree fever renders it unhelpful to petitioner in establishing that Chris had two *afebrile* seizures within a year of vaccination.

disorder, following a DPT vaccination, petitioner must prove, by a preponderance of the evidence, that in addition to receiving a Table vaccine in the United States—

(a) Chris did not suffer an afebrile seizure *before* the January 22, 1971 DPT vaccination; [20]

(b) Chris suffered a seizure (febrile or afebrile) within 72 hours of the January 22, 1971 DPT vaccination; *and*

(c) Chris suffered at least two afebrile seizures within one year of the January 22, 1971 DPT vaccination.

42 U.S.C. § 300aa–14(b).[21]

■ While a failure to establish just one of the above elements dispenses with petitioner's claim, the special master found that both elements (b) and (c) were not established. For the reasons detailed below, this court finds error with the special master's ruling on element (b), but upholds his determination on element (c). Because element (c) is a mandatory element in any claim of residual seizure disorder, petitioner's claim for compensation must, therefore, fail.

### Element (a)

The special master neglected to make an explicit finding as to whether petitioner established element (a) by a preponderance of the evidence. His decision instead focused on petitioner's inability to establish elements (b) and (c). Careful examination of petitioner's affidavit and medical records reveal that Chris suffered one, and only one, seizure before his DPT booster, and that was accompanied by a fever of more than 102 degrees Fahrenheit. Petitioner states in her affidavit

that Chris had his first convulsion on May 27, 1970. (Original Petition, Affidavit, page 14). Dr. White's office records and the Palms of Pasadena Hospital emergency room records confirm that Chris had a convulsion at about 12:15 a.m. with a fever of 102.4 degrees Fahrenheit.[22] (Original Petition, Exhibit 9, page 83). Respondent, on the other hand, offered no evidence that petitioner suffered an afebrile seizure or convulsion before the January 22, 1971 DPT booster. Therefore, in light of the evidence on the record, and the lack of a contrary finding by the special master, this court finds that petitioner has established that Chris did not suffer an afebrile convulsion before the January 22, 1971 DPT booster.

### Element (b)

■ Element (b) requires petitioner to prove that Chris had a seizure or convulsion within 72 hours of his January 22, 1971 DPT booster. Petitioner contends that the special master misread the Palms of Pasadena Hospital emergency room record of Monday, January 25, 1971, and that, if properly read and interpreted, it establishes the occurrence of a seizure 15 hours after Chris's Friday booster. The court agrees with petitioner that the special master committed error by attributing no weight at all to said document. (Special Master's Decision, page 9). The rational and plain meaning of the emergency room record lends unflinching support to petitioner's claim. No application of reasonable analysis would yield a different conclusion. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (stating that a trial court or agency judge acts in an arbitrary and capricious manner if

20. Afebrile, for the purposes of the Vaccine Act, means without fever or accompanied by a fever *less than* 102 degrees Fahrenheit. 42 U.S.C. § 300aa–14(b)(2).

21. Section 300aa–14(b)(2) provides in relevant part as follows:
 (2) A petitioner may be considered to have suffered a residual seizure disorder if the petitioner did not suffer a seizure or convulsion unaccompanied by fever or accompanied by a fever of less than 102 degrees Fahrenheit before the first seizure or convulsion after the administration of the vaccine involved and if. . . .

(B) in the case of [DPT vaccination], the first seizure or convulsion occurred within 3 days after administration of the vaccine and 2 or more seizures or convulsions occurred within 1 year after the administration of the vaccine which were unaccompanied by fever or accompanied by a fever of less than 102 degrees Fahrenheit.

22. The emergency room record was created shortly after the convulsion occurred on May 27, 1970. Dr. White's notes were dated May 28, 1970, the next day, when Chris made an office visit.

it entirely fails to consider an aspect of the problem or offers an explanation for its decision that runs counter to the evidence).

While the handwriting in this emergency room record is difficult to read, it is not illegible. And while the relevant entry in the record is not grammatically precise, the only reasonable interpretation supports petitioner's position. The January 25 entry reads, "[patient] was seen by Dr. White at 5:15 tonight—given shot—15 hrs later patient convulsed." (Exhibit 10, page 84). According to petitioner, the "shot" reflected in this entry is the booster Chris received on Friday, January 22, and the language "15 hrs later patient convulsed" refers to a convulsion on Saturday, 15 hours later. The special master, however, accorded the emergency room entry no weight because he concluded that it failed to clearly articulate whether the "shot" in the entry indeed referred to the Friday booster or some shot given on Monday at Dr. White's office. A convulsion 15 hours after a shot administered on Monday, the special master asserted, would fall outside the statutory 72 hour window.[23] (Special Master's Decision, page 9).

An examination of the events of Monday, January 25, 1971, reveals that the special master's confusion is unwarranted. The special master admits in his decision that "[w]hile the medical records document Dr. White seeing Chris on the 25th, *Chris was not given shots that day—he received his shots on January 22.*" (Special Master's Decision, page 9) (emphasis added). Dr. White's office records and petitioner's affidavit corroborate that Chris received his only shot on Friday, January 22. (Original Petition, Exhibit 6f, page 76; Exhibit 10, page 84; Affidavit, page 15). Moreover, the emergency room and doctor's records identify a DPT shot, on said Friday. (Original Petition, Exhibit 10, page 84; Exhibit 6f, page 76). If the Friday shot is the only shot established anywhere in the record for that weekend, the only rational conclusion is that the emergency room record is referring to the Friday, January 22, 1971 shot in the passage "[patient] was seen by Dr. White at 5:15 tonight—given shot—15 hrs later patient convulsed." (Exhibit 10, page 84). The

language "15 hrs later patient convulsed," therefore, must refer to the convulsion occurring on Saturday, January 23, 1971, which necessarily would be within 72 hours of the Friday (January 22, 1971) shot.

Furthermore, the fact that the emergency room record is a written document, recorded contemporaneously with the event of the alleged seizure disorder, counsels the fact finder to accord it substantial weight. Obviously, neither petitioner nor the doctor on duty in the emergency room that evening was motivated by litigation. The credibility of that exhibit, therefore, is not in issue. *Montgomery Coca–Cola Bottling Co. v. United States*, 615 F.2d 1318, 1328, 222 Ct.Cl. 356 (1980); *United States v. United States Gypsum Co.*, 333 U.S. 364, 396, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1947) (noting that, in general, written documentation recorded by a disinterested person at or soon after the event at issue is more reliable than the recollection of a party to a lawsuit years later).

### Element (c)

Finally, element (c) requires petitioner to establish that two afebrile seizures occurred within one year of the DPT booster, on January 22, 1971. 42 U.S.C. § 300aa–14(b)(2). While the record indicates that Chris experienced seizures after his January 22, 1971 vaccination, the record does not indicate that those seizures were afebrile. Petitioner insists that Chris suffered an afebrile seizure late at night on Monday, January 25, 1971, on March 11, 1971, and a series of five on August 31, 1971. The record indicates, however, that each of these seizures was accompanied by a fever of at least 102 degrees Fahrenheit.

Exhibit 6f, recorded by Dr. White on Tuesday, January 26, 1971, indicates that, while Chris suffered a seizure sometime Monday evening, his temperature was 103 degrees Fahrenheit. (Original Petition, Exhibit 6f, page 76). Exhibit 12, an emergency room record of March 11, 1971, indicates that Chris suffered a seizure that was accompanied by a 104 degree fever. (Original Petition, Exhibit 12, page 87). According to Exhibits 11 and 14aa, Chris suffered a series of five seizures on August 31, 1971. During

---

**23.** 42 U.S.C.A. § 300aa–14(a).

this period, Chris's temperature was between 102 degrees and 103.6 degrees Fahrenheit. (Original Petition, Exhibit 11, page 85; Exhibit 14aa, page 91). Nothing in petitioner's affidavit suggests that any of the seizures within a year of the January 22, 1971 vaccination were *afebrile*.[24] (Original Petition, page 13).

The special master's reasoning with regard to element (c) reflects a sound and thorough treatment of the facts on the record. The court, therefore, upholds the special master's determination that petitioner failed to establish element (c), and, therefore, denies petitioner's second assignment of error.

### D. Issue (3)

■■■ Petitioner's third assignment of error alleges that the special master arbitrarily denied petitioner a hearing. We find that assertion to be totally void of merit. The Vaccine Act delegates to the special master complete authority to grant a hearing in a vaccine case. Moreover, the parties have absolutely no right to demand one. 42 U.S.C. § 300aa–12(d)(3)(B); RCFC App. J, Rule 8(d).[25] The court in *Hale v. Sec'y DHHS*, 22 Cl.Ct. 403 (1991), held that "[t]he rules on hearing requirements under the Vaccine Act are clear. . . . [A] special master is not required to conduct an evidentiary hearing where one is not shown to be necessary." Discretion resides entirely with the special master to hold a hearing. Moreover,

if convening a hearing would frustrate Congress's objective of making the proceedings expeditious, flexible, and less adversarial, the special master has a duty to deny the hearing. RCFC App. J, Rule 8(e), *see Plummer v. Secretary DHHS*, 24 Cl.Ct. 304, 307 (1991).

■■■ Here at bar, the special master decided not to hold a hearing after petitioner admitted that Dr. Morrell's legal troubles prevented him from appearing as a witness and that she was unable to retain a new medical expert. Convening an evidentiary hearing, given this record, we believe, would have in no way furthered the ends of justice, nor has the denial of such in any way prejudiced petitioner. We are so convinced because the parties clearly had ample opportunity to present and support their positions through briefs and submissions. Consequently, we find that the special master did not abuse his discretion in denying petitioner a hearing inasmuch the record demonstrates that he gave her more than ample time to make her case.

### E. Issue (4)

■■■ Petitioner contends, finally, that the special master based his decision on personal differences with her counsel. The language of the Special Master's decision itself, according to petitioner, indicates that counsel's behavior adversely affected the special master in his ruling.[26] The language to which peti-

---

24. Petitioner's affidavit, filed with her original petition on September 10, 1990, states that Chris's convulsion on January 25, 1971, was accompanied by a fever of 103.2 degrees Fahrenheit. (Original Petition, Affidavit, page 15). Her affidavit further mentions that Chris had a seizure on March 11, 1971, but does not indicate his temperature. The series of five seizures are likewise accounted for, but without indications as to accompanying temperature.

25. 42 U.S.C. § 300aa–12(d)(3)(B) provides in relevant part as follows:

(3)(B) In conducting a proceeding on a petition a special master—

(v) May conduct such hearings as may be reasonable and necessary.
There may be no discovery in a proceeding on a petition other than the discovery required by the special master.
RCFC Appendix J, Rule 8(d) provides in relevant part as follows:

(d) Decision Without Evidentiary Hearing. The special master may decide a case on the basis of written filings without an evidentiary hearing.

26. Petitioner refers to the following language from the Special Master's Decision (pages 10–11):

The court is compelled to comment that petitioner's counsel's performance in this case only prolonged the inevitable finding of no compensation. The court devoted more time to this case than virtually any other on its docket. Through numerous status conferences, the court explained the deficiencies in petitioner's case and what was needed to cure those defects. Counsel repeatedly failed to comply with court orders and to provide additional factual information in support of petitioner's claim. In the end, counsel played fast and loose with information contained in the record, making no effort to explain or recon-

tioner refers, we believe, merely reflects the special master's concern that petitioner's counsel violated ethical standards binding on all members of the Court of Federal Claims bar. While the special master's final decision may not be the most appropriate forum in which to voice these concerns, there is no indication that irrelevant or inappropriate factors influenced the special master's analysis or conclusions. The special master allowed petitioner more than two years to generate a case. Petitioner enjoyed liberal extensions to buttress the record, as well as numerous opportunities to repair the ailing report of its only medical expert. She now seeks to exploit the first sign of frustration in what otherwise has been a proceeding characterized by the special master's patience and understanding. The court, therefore, denies petitioner's fourth assignment of error, in that no showing of an abuse of discretion or arbitrary and capricious conduct has been established.

### CONCLUSION

For the reasons stated above, the court finds that petitioner failed to demonstrate that the special master's decision was arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with the law. We, therefore, DENY petitioner's motion for review and AFFIRM the special master's May 27, 1993 Decision denying compensation. The Clerk of the Court is directed to enter judgment accordingly and dismiss the petition. No costs.

**IT IS SO ORDERED.**

cile the entire record including petitioner's affidavit. Counsel's efforts went far beyond zealous representation and touches on outright misleading the court. This matter will be dealt with further in any attorney's fees submission as this case proceeded far too long and advanced far too little.