Suk Soon SONG, mother and natural
guardian of Nicholas Song, a
minor, Petitioner,

v.

SECRETARY OF DEPARTMENT
OF HEALTH AND HUMAN
SERVICES, Respondent.

No. 92–279V.

United States Court of Federal Claims.

March 29, 1994.

Milton Danon, New York City, attorney of record, for petitioner.

Mark Curtis Raby, Washington, DC, with whom was Asst. Atty. Gen. Frank W. Hunger, for respondent.

## OPINION

YOCK, Judge.

This case is before the Court on the petitioner's motion for review of Chief Special Master Gary J. Golkiewicz's December 9, 1993, order dismissing the petitioner's claim under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa–1 through 300aa–34 (1988 & Supp. III 1991) (the "Vaccine Act" or the "Act").[1] After a thorough review of the parties' respective submissions and the transcript from the hearing below, the Court denies the petitioner's motion for review and affirms the Chief Special Master's order and dismissal.

### Facts

For purposes of this review, the following facts are not in dispute: Nicholas Song was born to the petitioner on December 23, 1988. The prenatal period and delivery were uneventful. Except for noted hypotonia,[2] Nich-

---

1. Individual sections of the Act will be cited by section number, without reference to 42 U.S.C. § 300aa.

2. According to STEDMAN'S MEDICAL DICTIONARY 755 (25th ed. 1990), hypotonia is "[a] condition in which there is a diminution or loss of muscular tonicity, in consequence of which the muscles may be stretched beyond their normal limits."

olas developed normally until he received his second DPT injection on April 26, 1989. Nicholas developed a slight fever of 101 degrees on the day of the vaccination. On April 28, 1989, two days later, Nicholas appeared to have a series of two seizures, at which time he was taken by ambulance to the emergency room at Staten Island Hospital. On May 2, 1989, while still in the hospital, Nicholas had two more seizures. Immediately after his April 28 and May 2 seizures, Nicholas was examined and found to be alert. Numerous test were conducted on Nicholas throughout his hospital stay, including an EEG, a CAT scan and an MRI, all with normal findings. Nicholas was ultimately placed on anti-convulsive medication and discharged from the hospital on May 17, 1989, in "good condition."

On September 13, 1989, approximately five months after Nicholas's vaccination, Dr. Testa performed an examination on Nicholas and noted that he was attentive, sitting unassisted, smiling and saying "mama" and "dada." *Corrected Decision of Chief Special Master,* at 6 (December 15, 1993) (citing Hearing Transcript at 33). Accordingly, Dr. Testa concluded that Nicholas had achieved the appropriate milestones for a boy of Nicholas's age.

Dr. Walter Molofsky, the petitioner's expert, performed a medical examination of Nicholas on March 25, 1992. At that time, Dr. Molofsky noted that Nicholas had suffered no further seizures and he therefore discontinued the anti-convulsive medication. Moreover, Dr. Molofsky observed at that time that Nicholas had normal gross and fine motor functions, normal receptive vocabulary and comprehension, and that he was "alert, active and pleasant." *Corrected Decision of Chief Special Master,* at 3 (December 15, 1993). Dr. Molofsky did note, however, that

while Nicholas seemed to have normal intelligence, he had a delay in his expressive language function. Subsequent reports issued by Dr. Molofsky and Dr. Burton Banner confirmed the presence of both receptive *and* expressive language delays. As such, Nicholas is now enrolled in a special school accommodating children with such speech delays.

The petitioner filed for compensation under the Act on April 16, 1992, claiming that Nicholas suffered a presumptively vaccine-related residual seizure disorder which consisted of four afebrile seizure episodes starting within two days of a DPT vaccination. Although Nicholas suffered no further seizures, the petitioner claimed that Nicholas suffers the residual effects of learning disability, expressive language delay and hypotonia.

The respondent contested the petitioner's claim, arguing that even if the petitioner was able to show a presumptively vaccine-related injury, she could not meet the Act's requirement that she establish complications of that injury lasting more than six months after the vaccination. The respondent argued that Nicholas's current problems are unrelated to the seizure episodes he suffered after his DPT vaccination, and that as such, the petitioner cannot establish a continuing complication or residual effect of a presumptively vaccine-related injury.

On August 2, 1993, the Chief Special Master conducted a hearing in this matter. At the close of the hearing, the court issued a bench ruling in favor of the respondent. The Chief Special Master found that although the petitioner established a residual seizure disorder [3] under the Vaccine Injury Table (hereinafter the "Table"), she failed to establish a causal link between Nicholas's Table injury

---

3. According to the Act:

(2) A petitioner may be considered to have suffered a residual seizure disorder if the petitioner did not suffer a seizure or convulsion unaccompanied by fever or accompanied by a fever of less than 102 degrees Fahrenheit before the first seizure or convulsion after the administration of the vaccine involved and if—

* * * * * *

(B) in the case of [the DPT vaccine], the first seizure or convulsion occurred within 3 days

after administration of the vaccine and 2 or more seizures or convulsions occurred within 1 year after the administration of the vaccine which were unaccompanied by fever or accompanied by a fever of less than 102 degrees Fahrenheit.

42 U.S.C. § 300aa–14(b)(2) (1988).

and his subsequent language deficits. After considering the parties' post-hearing briefings, the Chief Special Master reaffirmed and expanded upon his bench ruling, concluding that the petitioner was not entitled to compensation under the Act.

On December 30, 1993, the petitioner filed her appeal requesting that this Court reverse the Chief Special Master's decision to deny compensation in this case. The petitioner bases her request in this Court on three considerations: First, the petitioner argues that the Chief Special Master's finding that there was no connection between Nicholas's current learning disability and his DPT vaccination was contrary to the express language of the Act and therefore contrary to law. Second, the petitioner contends that the Chief Special Master abused his discretion by making his factual finding that the complications of Nicholas's DPT vaccination did not last for more than six months. Finally, the petitioner argues that because the Chief Special Master allowed the respondent's expert to rely on questionably relevant medical articles, this Court must reverse the Chief Special Master's decision denying compensation.

The respondent counters that in order for the petitioner to have prevailed in the hearing below, she must have established with a preponderance of the evidence that there was a connection between Nicholas's current speech problems and the seizures he suffered in 1989. Because the respondent's expert, Dr. Joel Herskowitz, testified that there was no such connection, the respondent contends that the Chief Special Master's finding was within his discretion.

### Discussion

Title 42 of the United States Code, section 300aa–11(c) (1988) provides the requirements for a petition for compensation for a vaccine-related injury. That section indicates that a person may file a petition under the Act:

(B)(i) if such person received a vaccine set forth in the Vaccine Injury Table—
* * * * [and]

(C)(i) sustained, or had significantly aggravated, any illness, disability, injury or condition set forth in the Vaccine Injury Table in association with the [covered] vaccine * * * or died from the administration of such vaccine, and the first symptom or manifestation of the onset or of the significant aggravation of any such illness, disability, injury, or condition or the death occurred within the time period after vaccine administration set forth in the Vaccine Injury Table, or

* * * * * *

(D)(i) suffered the residual effects or complications of such illness, disability, injury, or condition *for more than 6 months* after the administration of the vaccine and incurred unreimbursable expenses due in whole or in part to such illness, disability, injury, or condition in an amount greater than $1,000 * * *.

*Id.* (emphasis added).

█ If a petitioner can allege that she met the time period for an injury specified in the Table, the Court will *presume* that the vaccine caused the specific Table injury. 42 U.S.C. § 300aa–11(c)(1)(C)(i) (1988 and Supp. III 1991); *Bunting v. D.H.H.S.*, 931 F.2d 867 (Fed.Cir.1991); *Hines v. D.H.H.S.*, 940 F.2d 1518 (Fed.Cir.1991). The specific Table injuries relevant to the case at bar are found in 42 U.S.C. § 300aa–14(a) (1988 and Supp. III 1991), which provides in pertinent part:

I. DTP; P; DTP/Polio Combination; or Any Other Vaccine Containing Whole Cell Pertussis Bacteria, Extracted or Partial Cell Bacteria, or Specific Pertussis Antigen(s).
Illness, disability, injury, or condition covered:

| | | |
|---|---|---|
| A. | Anaphylaxis or anaphylactic shock | 24 hours |
| B. | Encephalopathy (or encephalitis) | 3 days |
| C. | Shock-collapse or hypotonic-hyporesponsive collapse | 3 days |
| D. | Residual seizure disorder in accordance with subsection (b)(2) | 3 days |
| E. | Any acute complication or sequela (including death) of an illness, disability, injury, or condition referred to above which illness, disability, injury, or condition arose within the time period prescribed | Not applicable |

■ In his decision, the Chief Special Master found that Nicholas suffered two Table injuries within the specified time period, residual seizure disorder and encephalopathy.[4] As such, it is *presumed* that the DTP vaccine administered on April 28, 1989, caused those injuries. Although there is a statutory presumption that the vaccine caused the residual seizure disorder and the encephalopathy, there is no such additional presumption that the residual seizure disorder and the encephalopathy caused Nicholas's learning/speech disability.

■ The petitioner argues in her brief that because acute complications and sequela [5] of the specific injuries set forth in section 14(a)(I)(A)–(D) *are themselves made a Table injury* by section 14(a)(I)(E), and because there is no time limit applicable to acute complications and sequela, the Court should also presume that the sequela (*i.e.*, the learning/speech disability) was caused by the vaccine. In his decision, the Chief Special Master correctly observed that:

4. Under the Act, the term "encephalopathy" has a broader meaning than is generally given that term by physicians in a clinical setting. Under the Act:

 The term "encephalopathy" means any significant acquired abnormality of, or injury to, or impairment of function of the brain. Among the frequent manifestations of encephalopathy are focal and diffuse neurologic signs, increased intracranial pressure, or changes lasting at least 6 hours in level of consciousness, with or without convulsions. The neurological signs and symptoms of encephalopathy may be temporary with complete recovery, or may result in various degrees of permanent impairment. Signs and symptoms such as high pitched and unusual screaming, persistent unconsolable crying, and bulging fontanel are compatible with an encephalopathy, but in and of themselves, are not conclusive evidence of encephalopathy. Encephalopathy usually can be documented by slow wave activity on an electroencephalogram.

 42 U.S.C. 300aa–14(b)(3)(A) (1988 and Supp III 1991).

5. The term "sequela" is defined as "[a] morbid condition following or occurring as a consequence of another condition or event." DORLAND'S POCKET MEDICAL DICTIONARY 537 (24th ed.

To this court's knowledge, no decision has discussed [section 14(a)(I)(E)] in depth. It is clear, however, that § 14(a)(1)(E) is irrelevant to resolving this case. Whether it be [sic] one of the specific Table injuries in § 14(a)(1)(A)–(D) or the acute complication [or sequela] in § 14(a)(1)(E), petitioner must establish the § 11(c)(1)(D)(i) requirement that the injured "suffered the residual or complications of" the Table injury for more than six months. It is this requirement that petitioner failed to meet.

*Corrected Decision of Chief Special Master,* at 5 (December 15, 1993). Stated another way, regardless of whether the petitioner suffered one or five Table injuries, she is still not entitled to compensation unless those injuries resulted in residual effects or complications lasting more than six months. Ultimately, therefore, it is unnecessary to resolve the issue of whether the acute complications and sequela provided for in section 14(a)(I)(E) are independent Table injuries which are entitled to the same presumption given to the four specific Table injuries set forth in section 14(a)(I)(A)–(D).[6]

1989). Also, "[a]n abnormal condition resulting from a previous disease." THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE, UNABRIDGED 1747 (2d ed. 1987). The term "complication" is defined as "1. Disease(s) concurrent with another disease. 2. occurrence of several diseases in the same patient." DORLAND'S POCKET MEDICAL DICTIONARY 139 (24th ed. 1989).

6. Without deciding the issue, it is perhaps appropriate to discuss the purpose and function of section 14(a)(I)(E) at this juncture. According to the legislative history of that section:

 Each portion of the Table also includes a provision for complications or sequelae of listed injuries which occur within the specified time periods. Thus, for example, if anaphylactic shock occurs within 24 hours of the administration of a DTP vaccine (i.e. within the specified time period), that injury is compensable if other conditions are met. If kidney failure occurs as a complication of that injury, it too is compensable, regardless of when the initial onset of kidney failure occurs.

 H.R.REP. 908, 99th Cong., 2d Sess. 1, at 19. Although the legislative history makes it clear that the specific Table injuries (*i.e.*, section 14(a)(I)(A)–(D)) enjoy a presumption that they

The petitioner further contends that "The DECISION overlooks the unreasonableness of expecting to find evidence of speech delay until such time as the child would become old enough to speak and also overlooks that section 11(c)(1)(C)(ii)(II) deals with this matter of a delay, if indeed a delay is perceived to exist in this case." *Brief for the Appellant–Petitioner*, at 6 (December 30, 1993). This argument, however, is fundamentally flawed. If indeed the petitioner had proven with a preponderance of the evidence that Nicholas's speech delay was caused by his encephalopathy or residual seizure disorder, it would not have mattered whether the speech delay manifested itself six months or six *years* after his DTP vaccination—and the Chief Special Master recognized this fact in his decision. Ultimately, however, as the Chief Special Master explained, regardless of the time of onset, any residual effect or complication must last for more than six months. The Special Master did not require the petitioner to establish a speech delay before Nicholas could speak, as the petitioner contends, but rather he only required the petitioner to prove that there was some connection between Nicholas's specific presumptive Table injuries (encephalopathy and residual seizure disorder) and his later speech delay. It was this connection that the petitioner failed to establish.

Moreover, it is axiomatic that if there is no connection between Nicholas's encephalopathy and residual seizure disorder and his later speech delay, there were no "residual effects or complications" that lasted for more than six months. As such, the Chief Special Master's factual finding that there was no such connection precludes recovery under the Act.

### A. Standard of Review

■ Prior to the enactment of the 1989 amendments, the Court was authorized to review proposed findings of fact or conclusions of law prepared by the special master and to make a de novo determination of any matter: 42 U.S.C. § 300aa–12(d)(1) (1988); *see also Davis v. D.H.H.S.*, 19 Cl.Ct. 134 (1989); *Bunting v. D.H.H.S.*, 19 Cl.Ct. 738 (1990). The amendments promulgated in 1989 precluded *de novo* review of all determinations made by the special master, and set forth varying standards of deference with regard to different aspects of the special master's decision. The current standard of review for cases arising under the Vaccine Act is found in 42 U.S.C. § 300aa–12(e)(2). That section provides in pertinent part:

(2) Upon a filing of a motion under paragraph (1) with respect to a petition, the United States Court of federal Claims shall have jurisdiction to undertake a review of the record of the proceedings and may thereafter—

\* \* \* \* \* \*

(B) set aside any findings of fact or conclusions of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law \* \* \*.

are related to vaccination when they occur within the specified time period, *Id.*, there is no such presumption that the alleged acute complications or sequelae were caused by those specific Table injuries as set forth in § 14(a)(I)(E). Indeed, such a presumption would defy logic, law and common sense. If *any* negative occurrence in a vaccine recipient's later life, regardless of temporal or medical relationship to the vaccine, could be presumptively attributed to the vaccine, the Act would serve as no less than comprehensive no-fault health insurance for all unpleasant occurrences in a vaccinee's later life. Section 14(a)(I)(E) was not intended to achieve such a result, but rather only to "emphasize that compensation is available not just for the acute vaccine reactions listed [*i.e.*, anaphylaxis, encephalopathy, shock collapse or residual seizure disor-

der] but also for those conditions *which result from these reactions.*" H.R.REP. 908, 99th Cong., 2d Sess. 1, at 19 (emphasis added). As such, the only purpose of section 14(a)(I)(E) was to establish that upon a showing that a petitioner has suffered a *specific* Table injury, the complications which are shown to have been causally connected to those specific injuries are compensable under the Act as well. Indeed, by their very definition, the terms "complication" and "sequela" require a causal relationship between an earlier event and later events.

Thus, in the case at bar, even assuming *arguendo* that section 14(a)(I)(E) provides for a separate Table injury, the petitioner failed to establish that Nicholas's learning disability is an "acute complication" or "sequela" of the encephalopathy and residual seizure disorder he suffered.

42 U.S.C. § 300aa–12(e)(2) (1988 & Supp. III 1991). Under this standard, the special master's findings of fact are reviewed under the arbitrary and capricious standard; legal questions under the "not in accordance with the law" standard; and discretionary rulings are reviewed under the abuse of discretion standard. *See, e.g., Neher v. D.H.H.S.,* 984 F.2d 1195, 1198 (Fed.Cir.1993); *Munn v. D.H.H.S.,* 970 F.2d 863, 870 n. 10 (Fed.Cir. 1992); *Hines v. D.H.H.S.,* 940 F.2d 1518, 1524 (Fed.Cir.1991); *Hale v. D.H.H.S.,* 22 Cl.Ct. 403, 406 (1991).

▆▆ This case was resolved at the hearing below by the Chief Special Master's factual finding that there was no medical correlation between Nicholas's specific Table injuries and his later speech delay. As such, the scope of review here is narrow, and the Court is not to substitute its judgment for that of the Chief Special Master. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The Special Master's decision must stand if it is based on a consideration of the relevant factors and there has been no clear error of judgment. *Hines v. D.H.H.S.,* 940 F.2d 1518, 1524, 1527–28 (Fed.Cir.1991). Thus, if the Chief Special Master considered the relevant evidence in the record as a whole, drew rational inferences from the evidence and then articulated a logical basis for his decision, his decision must stand. *Id.* at 1528.

▆▆ As the Chief Special Master noted in his decision, the petitioner's expert, Dr. Molofsky, offered only his conclusory statements that Nicholas's current speech delays were the result of his Table injuries. The following excerpt from the transcript is typical of Dr. Molofsky's conclusory testimony:

Q And within a reasonable degree of medical certainty, would you render an opinion about the cause of the [speech delays]?

A It's my opinion that this child received his DTP shot that resulted in a series of seizures, and that his subsequent development has demonstrated deficiencies in the areas that we've noted which were responsible, sequela in that.

\* \* \* \* \* \*

THE COURT: You're not going to ask the doctor of the relationship of the child's current condition to the seizures that were suffered after the DTP shot?

MR. DANON: Yes. He made reference to that in the last question. Correct. He said the DPT shot caused the seizures and his present condition. Am I correct in that, Dr. Molofsky?

THE WITNESS: Yes.

Hearing Transcript, at 8–9 (July 26, 1993).

Again, when specifically asked by the court to address the link between the Table injuries and the speech delays, Dr. Molofsky simply concluded, without explanation, that the vaccine was responsible for the speech delay.

THE COURT: I just have one, Doctor Molofsky. I'm a little confused at this point as to why you believe the speech problems are related to the seizure disorder.

THE WITNESS: I think you misunderstand the direct link. This child had a DTP shot, followed by a series of seizures. The seizures indicated to me that he suffered encephalopathy, and as a result of that, he now has the speech and language problem. The seizures are a marker, not a specific cause.

*Id.* at 16.

On review, looking at the record as a whole, the Special Master was correct when he stated, "[u]nfortunately, this type of conclusory statement is the only information Dr. Molofsky presented to the court." *Corrected Decision of Chief Special Master,* at 6 (December 15, 1993). It is clear from the record that Dr. Molofsky understood that speech delays can be caused by a number of factors:

You can see them in a variety of disorders that cause damage or dysfunction of the central nervous system. Prenatal and neonatal trauma, genetic problems, metabolic problems, toxic encephalopathies, infections, encephalitis, hemorrhages, neoplasms, a whole variety of causes have been identified with these conditions. There's also a large group, as you've mentioned, that have no identifiable cause.

Hearing Transcript, at 15 (July 26, 1993). Unfortunately, as the Chief Special Master noted, Dr. Molofsky simply failed to explain why, in his opinion, it was more likely than not that Nicholas's speech delay was caused by the Table injuries he suffered and not by any of the many other factors he previously identified. *Corrected Decision of Chief Special Master*, at 7 (December 15, 1993).

On the other hand, the respondent's expert, Dr. Herskowitz, clearly recognized and testified about the problems with making a causal link between Nicholas's encephalopathy and residual seizure disorder and his speech problems. Dr. Herskowitz relied on the fact that Nicholas suffered no loss of clinically significant milestones between the date of his seizures and almost six months later. Nicholas's EEG, did not show slow brain waves, there was no unusual or high-pitched screaming, unconsolable crying, intracranial pressure or loss of consciousness lasting six hours. Moreover, five months after his seizures, Nicholas was attentive, sitting unassisted, smiling and saying "mama" and "dada." According to Dr. Herskowitz:

> If there is an intervening period of four or five months or longer, and there are no clinical markers to allow me to hang my hat on it, then I would say it's not related. I'm always looking for things that are ideologically [sic] significant, but the fact that something happened four months earlier does not necessitate a link. The time is too long, and without paralysis or atrophy of one side of the brain on the EEG, or failure to. develop, if the child globally failed to develop, I'd say lack of development of language is simply one evidence of this child's failure to develop. But this child did not fail to develop globally, at least until nine months, and the delays were noted later.

*Corrected Decision of Chief Special Master*, at 6–7 (December 15, 1993). Dr. Herskowitz indicated that he did not expect to see speech delays before the child could speak, as the petitioner contends, but rather only indicated that he would require other clinically significant markers to be present before he would

find a link between the Table injuries and a later problem.

According to Dr. Herskowitz:

> One might raise the question, I mean, four month old children don't talk and five month old children do not talk. So if there was an early injury, one would not expect to see that language problem until later, so one could ask reasonably, could there be an early injury that later is manifested by failure to develop language at the proper time. And the answer is yes. Such evidence in this case might be acute findings at the time of the hospitalization to suggest that there was a problem affecting the left hemisphere that might be signified by paralysis in the right side of the body. It might be signified by right-sided seizures becoming secondarily generalized or not. It might be evidenced by swelling of the brain on one side of the body, excuse me, one side of the brain rather than the other * * *. And because we do not have any such evidence, and indeed the EEG did not show focally abnormal findings, in fact it was normal. *There was nothing that I could find that suggested, by laboratory data or clinical presentation, that the child injured the brain at four months [the date of the seizures] and that a subsequent dysfunction [the speech delay] was manifested later.*

*Hearing Transcript*, at 34–35 (July 26, 1993) (emphasis added).

Because the Court concludes that he made a rational decision based on the facts in front of him, the Chief Special Master's decision was neither arbitrary nor capricious. The Chief Special Master's decision to give the respondent's expert's testimony greater weight than the petitioner's expert's testimony was reasonable in light of the record in this case, and his judgment on the credibility of the witnesses must therefore stand. *Cox v. D.H.H.S.*, 30 Fed.Cl. 136 (1993); *Piper v. D.H.H.S.*, 29 Fed.Cl. 628, 641 (1993) (citing *Griessenauer v. Dept. of Energy*, 754 F.2d 361, 364 (Fed.Cir.1985) and *Hambsch v. Dept. of Treasury*, 796 F.2d 430, 436 (Fed. Cir.1986)) (The determination of the credibility of the witnesses is within the discretion of the presiding official who heard their testi-

mony and saw their demeanor. "These determinations are virtually unreviewable."); *Ultimo v. D.H.H.S.,* 28 Fed.Cl. 148, 152 (1993) ("the Chief Special Master was, again, in the best position to determine the credibility and competency of potential witnesses.").

B. *Petitioner's Relevance Objection*

In the alternative, the petitioner argues that this Court should reverse the decision of the Chief Special Master because the respondent's medical expert partially based his testimony on medical literature that the petitioner argues was not relevant to the case at bar. According to the petitioner:

> In this case, Dr. Herskowitz, the expert for the respondent, based his testimony on three medical articles which reported on four studies in children who had febrile seizures, and the effect, if any, on I.Q. In the case at bar the concern is about the DPT vaccine causing an injury, not about a seizure causing an injury.
>
> None of the articles considered vaccine-induced injuries; therefore, they had no relevance to this case. * * * The Chief Special Master erred in accepting an expert's opinion when the expert himself states that it was based on irrelevant data.

*Brief for the Appellant–Petitioner,* at 11–12 (December 30, 1993).

 Even if the petitioner's claim was correct, which it is not, the Act states that the procedural rules to be applied by special masters shall "provide for a less-adversarial, expeditious, and informal proceeding for the resolution of petitions," and specifically that they shall "include flexible and informal standards of admissibility of evidence." 42 U.S.C. § 300aa–12(d)(2)(A), (B) (1988 and Supp. III 1991). "The Claims Court has correctly interpreted this provision to mean that the Federal Rules of Evidence need not be followed in proceedings under the Act * * *." *Hines v. D.H.H.S.,* 940 F.2d 1518, 1525 (Fed.Cir.1991); *see also Cox v. D.H.H.S.,* 30 Fed.Cl. 136, 143 (1993). To this extent, while not bound by common law or statutory rules of evidence, basic principles of fundamental fairness to the parties govern the review of evidence. *Cox,* 30 Fed.Cl. at 143. The proper inquiry, therefore, is not whether the allegedly objectionable articles

are relevant as defined by Fed.R.Evid. 401, but only whether it would amount to fundamental unfairness to allow testimony based on those articles.

 Unfortunately for the petitioner, her arguments concerning the "relevance" of the articles at issue are just as conclusory as her expert's statements concerning Nicholas's speech delay. In her brief, the petitioner gives no basis for her conclusion that the articles were irrelevant other than the fact that the articles discuss studies that did not address vaccine-related seizures. The articles did, however, apparently discuss the relationship (or lack thereof) between febrile seizures and later learning disabilities; and, while Dr. Herskowitz admitted on cross-examination that the studies would have perhaps been more on point had they included vaccine-induced seizures, he still believed the articles helpful as "the best available information." *Hearing Transcript,* at 43 (July 26, 1993). Moreover, the petitioner's expert, on cross-examination, not only acknowledged that the articles at issue were authoritative in his field, but he also testified that he generally agreed with their findings. *Id.* at 19–22.

As such, this Court cannot hold that it was fundamentally unfair to allow the respondent's expert to rely on these articles, especially in light of the petitioner's opportunity to cross-examine the witness on those articles or refute the articles during the examination of her own expert witness.

*CONCLUSION*

For the reasons stated above, the Court finds that the petitioner has failed to demonstrate that the Chief Special Master's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Therefore, the Court denies the petitioner's motion for review and sustains the Chief Special Master's December 9, 1993, order, as corrected on December 15, 1993, dismissing the petitioner's claim. The clerk of the Court is directed to enter judgment accordingly.

No costs on review.