John HOSSACK and Charlene Hossack, on behalf of their deceased minor child, Jeffrey Hossack, Petitioners,

v.

SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 91–1528V.

United States Court of Federal Claims.

Feb. 3, 1995.

John R. Brydon, San Francisco, CA, for petitioners.

Mary Hampton Mason, Washington, DC, with whom was Asst. Atty. Gen. Frank W. Hunger, for respondent.

OPINION

YOCK, Judge.

This case is before the Court on respondent's Motion for Review of Special Master E. LaVon French's August 18, 1994, memorandum decision, *Hossack v. Secretary of Dep't of Health & Human Servs.*, No. 91–

1528V (Sp.Mstr.Fed.Cl.1994) (hereinafter Dec.), granting compensation to petitioners under the National Childhood Vaccine Injury Act of 1986 (the Act or the Program).[1] For the reasons discussed herein, this Court affirms the special master's decision.

## Background

Petitioners, John and Charlene Hossack, filed a petition [2] on behalf of their son Jeffrey on October 21, 1991, alleging that Jeffrey suffered an HHE/shock collapse [3] and died within the statutorily relevant three-day period following a diphtheria-pertussis-tetanus (DPT) vaccination. In its response, the United States Department of Health and Human Services (HHS) denied petitioners' entitlement and moved for dismissal. Special Master French held an evidentiary hearing in San Francisco, California, on March 1, 1994.

At the hearing, petitioners presented the testimony of Charlene and John Hossack and Dr. Kevin C. Geraghty (a pediatrician, immunologist, and allergist). HHS responded with the testimony of Ms. Laura E. Synhorst (deputy coroner for Sacramento County), Dr. Arnold Gale (a pediatrician and pediatric neurologist), and Dr. Virginia Anderson (a pediatric pathologist). The special master found "no serious challenge to the veracity of the records or the credibility of the fact witnesses. * * * [B]oth parents testified truthfully and candidly about the traumatic circumstances surrounding the death of their son. * * * [T]he factual testimony was cogent and persuasive. * * * [The course of events were] as his parents described in their testimony." Dec. at 6.

Jeffrey Hossack was born on August 29, 1989. During the first several weeks of his

1. The statutory provisions governing the Vaccine Act are found at 42 U.S.C. §§ 300aa–1 *et seq.* (1988 & Supp. V 1993). Hereinafter, for ease of citation, all references will refer to the relevant subsection of the current amended version of 42 U.S.C. § 300aa.

2. The Vaccine Act grants compensation to victims of vaccine-related injuries. The first step to request such compensation is to file a petition as outlined in the statute:

"A petition for compensation under the Program for a vaccine-related injury or death shall contain * * * an affidavit, and supporting documentation, demonstrating that the person who suffered such injury or who died—

"(A) received a vaccine set forth in the Vaccine Injury Table * * *

"(B)(i) if such person received a vaccine set forth in the Vaccine Injury Table—

(I) received the vaccine in the United States or in its trust territories,

\* \* \* \* \* \*

"(C)(i) sustained, or had significantly aggravated, any illness, disability, injury or condition set forth in the Vaccine Injury Table in association with the vaccine referred to in subparagraph (A) or died from the administration of such vaccine, and the first symptom or manifestation of the onset or of the significant aggravation of any such illness, disability, injury, or condition or the death occurred within the time period after vaccine administration set forth in the Vaccine Injury Table, or

"(ii)(I) sustained, or had significantly aggravated, any illness, disability, injury or condition not set forth in the Vaccine Injury Table but which was caused by the vaccine referred to in subparagraph (A), or

"(II) sustained, or had significantly aggravated, any illness, disability, injury or condi-

tion set forth in the Vaccine Injury Table the first symptom or manifestation of the onset or significant aggravation of which did not occur within the time period set forth in the Table but which was caused by a vaccine referred to in subparagraph (A),

"(D)(i) suffered the residual effects or complications of such illness, disability, injury or condition for more than 6 months after the administration of the vaccine and incurred unreimbursable expenses due in whole or in part to such illness, disability, injury, or condition in an amount greater than $1000 or (ii) died from the administration of the vaccine, and

"(E) has not previously collected an award or settlement of a civil action for damages for such vaccine-relate injury or death * * *."

Section 11(c)(1).

3. A hypotonic-hyporesponsive episode (HHE) is an abrupt change in muscle tone and level of consciousness, usually brief with no permanent injury, while a shock collapse (sometimes HHC) is "a drop in blood pressure that occurs either when the heart is incapable of pumping blood sufficiently, or when the blood vessels dilate so that blood pools in extremities and the body cavity so that there is inadequate blood returning to the heart to pump." Dec. at 7. For further description of HHE/shock collapse, *see* Aids to Interpretation, *infra* note 5. The special master remarked that "experts agreed that an HHE and a shock collapse are not the same thing. While this may be true in a strict medical sense, the statutory scheme makes no such distinction." Dec. at 8. Because the Vaccine Act lumps both conditions together, making any difference legally irrelevant, this Court uses HHE, HHC, and shock collapse interchangeably.

life, Jeffrey displayed a healthy development, excellent motor skills, and a high level of awareness and curiosity. Then on the afternoon of October 31, 1989, he received a DPT inoculation. Dec. at 4–5.

Although Jeffrey cried some at the clinic, he was not particularly fussy on the drive home. Soon after arriving home, however, his mother noticed that he was uncharacteristically lethargic and limp, and he lacked interest in food or attention. Dec. at 5. His father likewise was surprised when Jeffrey laid his head down limply on his father's shoulder instead of looking around actively as was his custom. At 9:00 p.m., Jeffrey began crying intensely and inconsolably. Id. For two hours, attempts to satisfy him met with no success. Eventually at 11:00 p.m., Jeffrey fell asleep. At 1:00 or 1:30 a.m., he again awoke crying and very agitated. Although he took three or four ounces of formula, he did not calm down or return to sleeping, as he normally would do. Forty-five minutes were required before he fell asleep again. Finally at 3:00 a.m., Jeffrey let out a painful shriek, and Mrs. Hossack thought that perhaps he had bumped his sore leg. Id. at 6. When Jeffrey did not continue to cry, his parents assumed that he had gone

back to sleep, and therefore they did not go into his room to investigate. Id.

■ Mrs. Hossack discovered Jeffrey at 8:00 a.m. in his crib on his stomach "discolored and stiff." Dec. at 6 (quoting Tr. at 44–45). Attempts at resuscitation failed, and at 8:40 a.m. on November 1, 1989, approximately eighteen hours after receiving his DPT inoculation, Jeffrey was pronounced dead upon arrival at the hospital. His death was classified on the death certificate as Sudden Infant Death Syndrome (SIDS).[4]

At the hearing in San Francisco, three medical experts testified regarding the possible existence of a Table injury and the cause of death. The petitioners' expert witness, Doctor Geraghty, testified that, in his medical opinion, Jeffrey sustained an unwitnessed HHE, culminating in a shock collapse, which caused Jeffrey's death. He based his opinion on the description of Jeffrey's behavior which the parents provided. He testified that none of Jeffrey's symptoms, taken individually or as a subset, were adequate to indicate an HHE. However, taken together and given their severity, the symptoms did lead to the conclusion, according to Doctor Geraghty, that Jeffrey suffered an HHE/shock collapse.

---

4. SIDS is the "'sudden unexpected death of an apparently healthy infant, typically occurring between the ages of three and five months and not explained by careful post-mortem studies.'" Hellebrand v. Secretary of Dep't of Health & Human Servs., 999 F.2d 1565, 1566 n. 2 (Fed.Cir. 1993) (quoting Dorland's Illustrated Medical Dictionary, 1644–45 (27th ed. 1988)).

The Vaccine Act allows the Government to overcome a petitioner's prima facie case, if the Government can show by a preponderance of the evidence that an injury "is due to factors unrelated to the administration of the vaccine described in the petition." Section 13(a)(1)(B). But such factors may "not include any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness, or condition * * *." Section 13(a)(2)(A). See, e.g., Knudsen v. Secretary of Dep't of Health & Human Servs., 35 F.3d 543, 547–48 (Fed.Cir.1994); Koston v. Secretary of Dep't of Health & Human Servs., 974 F.2d 157, 160–61 (Fed.Cir.1992). Although HHS continues to raise the SIDS diagnosis as a tool to thwart petitioners' case, such a diagnosis can neither prevent petitioners from establishing their prima facie case, nor serve as any kind of defense or alternative cause of injury due to factors unrelated to the administration of the vaccine. Special masters have consistently held

that SIDS is an idiopathic, unexplained, and unknown diagnosis, and as such cannot defeat a petitioner's established case. Tennyson v. Secretary of Dep't of Health & Human Servs., No. 90–605V, 1991 WL 35494 (Cl.Ct.Sp.Mstr. March 1, 1991) (Sp.Mstr. Wright). Lee v. Secretary of Dep't of Health & Human Servs., No. 90–15V, 1990 WL 293861 (Cl.Ct.Sp.Mstr. Oct. 15, 1990) (Sp.Mstr. Wright); Batdorf v. Secretary of Dep't of Health & Human Servs., No. 89–77V, 1990 WL 293395 (Cl.Ct.Sp.Mstr. Apr. 11, 1990) (Sp.Mstr. Bernstein); Ionescu v. Secretary of Dep't of Health & Human Servs., No. 88–64V, 1989 WL 250134 (Cl.Ct.Sp.Mstr. Oct. 19, 1989) (Sp.Mstr. Hastings); Pusateri v. Secretary of Dep't of Health & Human Servs., No. 88–63V, 1989 WL 250141 (Cl.Ct.Sp.Mstr. Oct. 10, 1989) (Sp.Mstr. French);

SIDS merely means an unexplained death. Special masters and judges tend to give little weight to such a diagnosis because "SIDS is neither a cause nor a result. It is an appellation for failure of medical knowledge. Naming a death 'SIDS' does not mean that it had no cause; it means that the cause of death was not determined or determinable, to the requisite medical certainty, by the techniques used by the diagnostician." Hodges v. Secretary of Dep't of Health & Human Servs., 9 F.3d 958, 963 (Fed.Cir.1993) (Newman, J., dissenting).

He testified that the parents had reported all of the factors indicative of an HHE, except the symptoms which immediately caused Jeffrey's death, *i.e.*, respiratory and cardiac arrest.[5] The special master found this testimony to be very helpful and reasonable in "establishing the significance of the constellation of [Jeffrey's] symptoms taken as a whole." Dec. at 8. She noted that Doctor Geraghty's opinion coincided with the statutory guidelines for HHE/shock collapse, and she found Doctor Geraghty to be a very credible witness. *Id.*

Doctor Gale, the Government's pediatric specialist, believed that Jeffrey's symptoms fell within the range of normal reactions to DPT vaccinations. Doctor Gale would expect stronger, more severe symptoms before he would conclude that Jeffrey experienced an HHE/shock collapse. The special master disagreed with Doctor Gale and found that "Jeffrey's reaction to the DPT vaccination went beyond Dr. Gale's explanation of [ ] what is normally expected." Dec. at 8. Instead, the special master found that Jeffrey did indeed suffer an HHE/shock collapse. *Id.*

The Government also presented Doctor Anderson, a pathologist, who testified to the condition of critical organs and cells in Jeffrey's body. She stated that the heart fiber cells, thymus, adrenal gland, brain neurons and lungs were all perfectly normal. In weighing these results, the special master found it "[c]rucial to the potential dispositiveness of this evidence," that Doctor Anderson also admitted that a pathological examination would not detect any useful information if an HHE/shock collapse were to last less than four to six hours. Dec. at 8. Due to the uncertain ramifications of this pathological examination, the special master gave the results and her testimony little weight.[6] Dec. at 8.

Both Doctor Geraghty and Doctor Gale agreed that death is a possible result of an HHE/shock collapse. Yet, Doctor Gale, of course, did not believe that Jeffrey suffered anything profound enough to result in death. Doctor Geraghty, on the other hand, was of the opinion that Jeffrey's death was the direct result of an HHE/shock collapse. Dec. at 7; Tr. at 132. The special master agreed, finding that after the DPT vaccination, Jeffrey's condition followed a continuously downward trend ending in his death less than twenty-fours later. She specifically found in her conclusion that petitioners and their expert had proven by a preponderance of the evidence that:

3. Jeffrey was administered a vaccine listed in the Vaccine Injury Table.

\* \* \* \* \* \*

5. There is a preponderance of the evidence that Jeffrey suffered an HHE/shock collapse with onset within 72 hours of the administration of the DPT vaccination on October 31, 1989.

6. \* \* \* Jeffrey's death was a sequela of the DPT vaccine-related HHE/shock collapse.

Based on the foregoing, the undersigned finds, after considering the entire record in this case, that petitioners are entitled to

---

5. The Vaccine Act, in its typical, highly technical and medical tone, provides a section entitled "Qualifications and aids to interpretation," which reveals that a shock collapse/HHE:

"[M]ay be evidenced by indicia or symptoms such as decrease or loss of muscle tone, paralysis (partial or complete[) ], hemiplegia or hemiparesis, loss of color or turning pale white or blue, unresponsiveness to environmental stimuli, depression of consciousness, loss of consciousness, prolonged sleeping with difficulty arousing, or cardiovascular or respiratory arrest."

Section 14(b)(1).

6. Witness credibility and weight are, of course, clearly within the sound discretion of the special master. Special masters are given "wide lati-

tude" in weighing evidence, conducting proceedings, and adjudicating claims. *Hellebrand v. Secretary of Dep't of Health & Human Servs.*, 999 F.2d 1565, 1571 (Fed.Cir.1993). The statute provides that special masters may consider many kinds of evidence, but none are binding upon a special master. Sections 12(d) & 13(b)(1). The special master is uniquely placed to judge witness credibility. *Burns v. Secretary of Dep't of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir.1993); *Richardson v. Secretary of Dep't of Health & Human Servs.*, 23 Cl.Ct. 674, 678 (1991). Indeed, a special master's determinations regarding witness credibility are "virtually unreviewable." *Bradley v. Secretary of Dep't of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed.Cir.1993); *Hambsch v. Dep't of the Treasury*, 796 F.2d 430, 436 (Fed.Cir.1986).

compensation in the amount of $250,000 for the vaccine-related death of Jeffrey Hossack.

Dec. at 10 (citations omitted).

*Discussion*

I.

■ The Government has petitioned this Court for review of the special master's decision, claiming that the special master erred in her articulation of the standard for proving a sequela (*i.e.,* death) under the Vaccine Program. Specifically, the Government takes issue with the special master's statement in her decision that the petitioner only needs to prove the *fact* of death and that the death *could* have been caused by the Table injury (HHE/shock collapse), in order to recover for Jeffrey's death under the Program. The Government contends that the correct standard for proving a sequela (*i.e.,* death) requires the petitioner to prove that the Table injury (in this case, the HHE/shock collapse) actually caused the death. Since the special master articulated a lower standard of proof, the Government submits that the decision should be remanded for further evaluation of the evidence based on the proper standard of proof required.

■ This Court reviews such legal questions *de novo. Pierce v. Underwood,* 487 U.S. 552, 558, 108 S.Ct. 2541, 2546, 101 L.Ed.2d 490 (1988). The Vaccine Act itself provides that the United States Court of Federal Claims is authorized to "set aside any findings of fact or conclusion[s] of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law * * *." Section 12(e)(2)(B). Absent such findings, this Court must either uphold the findings of fact and conclusions of law and sustain the decision, or remand the petition to the special master for further action in accordance with the Court's directions. Sections 12(e)(2)(A) and (C). The "not in accordance with law" standard applies to legal questions such as those raised here and warrants *de novo* review. *Neher v. Secretary of Dep't of Health & Human Servs.,* 984 F.2d 1195, 1198 (Fed.

Cir.1993); *see also Bradley v. Secretary of Dep't of Health & Human Servs.,* 991 F.2d 1570, 1574 n. 3 (Fed.Cir.1993); *Munn v. Secretary of Dep't of Health & Human Servs.,* 970 F.2d 863, 870 n. 10 (Fed.Cir.1992); *Hodges v. Secretary of Dep't of Health & Human Servs.,* 9 F.3d 958, 960 (Fed.Cir. 1993).

■ The Vaccine Act provides two methods for a victim of an injury or condition to prove that the problem is vaccine-related. First, a petitioner may recover if he or she proves by a preponderance of the evidence that he or she suffered a specified injury appearing within the statutory scheme—often called a Table injury—within the applicable statutory time period after the vaccination.[7] Sections 11(c)(1)(C)(i) and 14. With this method, the Court presumes that a vaccination caused a Table injury. *Hines v. Secretary of Dep't of Health & Human Servs.,* 940 F.2d 1518 (Fed.Cir.1991); *Bunting v. Secretary of Dep't of Health & Human Servs.,* 931 F.2d 867 (Fed.Cir.1991). The Table injuries listed for DPT vaccinations are:

VACCINE INJURY TABLE

I. DTP; * * *

| Illness, disability, injury or condition covered: | Time period for first symptom or manifestation of onset or of significant aggravation after vaccine administration: |
|---|---|
| A. Anaphylaxis or anaphylactic shock | 24 hours |
| B. Encephalopathy (or encephalitis) | 3 days |
| C. *Shock-collapse or hypotonic-hyporesponsive collapse* | 3 days |
| D. Residual seizure disorder in accordance with subsection (b)(2) | 3 days |
| E. Any acute complication or *sequela (including death)* of an illness, disability, injury or condition referred to above which illness, disability, injury or condition arose within the time period prescribed | Not applicable |

---

7. The Government may rebut this presumption by demonstrating, by a preponderance of the evidence, that the injury was due to a cause not related to the vaccination. Section 13(a).

Section 14(a)(I) (emphasis added). As a second method for recovering, if a petitioner suffers a non-Table injury, or if the injury occurs later than the specified time period, the petitioner may still obtain compensation if he or she can prove by a preponderance of the evidence that the vaccination *in fact caused* the injury. Section 11(c)(1)(C)(ii).

When a death follows a DPT vaccination, a petitioner may recover using the presumptive causation approach, if he or she establishes two things. "*First,* the petitioner must show that one of the four injuries or conditions listed in the Table occurred within the time period specified in the Table for that injury or condition. *Second,* the petitioner must show that death occurred as a sequela of that injury or condition." *Hellebrand v. Secretary of Dep't of Health & Human Servs.,* 999 F.2d 1565, 1569 (Fed.Cir.1993). The term "sequela" has been identified as "any lesion or affection following or caused by an attack of disease," Dorland's Illustrated Medical Dictionary 1509 (27th ed. 1988), or a "condition following as a consequence of a disease," Stedman's Medical Dictionary 1407 (25th ed. 1990). Most recently this Court defined the terms "complication" and "sequela" as "somatic conditions or events recognizable as the pathological sequence or result of an existing disease or disorder or as an independent accompaniment of such disease or disorder." *Abbott v. Secretary of Dep't of Health & Human Servs.,* 27 Fed.Cl. 792, 794 (1993), *aff'd in pertinent part, remanded in part,* 19 F.3d 39 (Fed.Cir.1994).

In this case, HHS contends that the special master articulated a standard for proving a sequela which is contrary to law. Particularly objectionable to the Government in the instant case is the following paragraph, where the special master stated that:

Petitioner need not prove that the death was caused, in fact, by the Table injury—

clinical proof of a linkage is not required. *Brown v. Secretary of HHS,* No. 90–9040V (Cl.Ct.Spec.Mstr. July 27, 1992). Indeed, it is only necessary that petitioner be able to prove, by a preponderance of the evidence, that 1) the sequela occurred, and 2) the sequela "could have resulted from the Table injury." *Zinko v. Secretary of HHS,* 24 Cl.Ct. 430, 432 (1991), *appeal dismissed,* 960 F.2d 154 (Fed.Cir.1992). The evidence however, must not consist of a hypothetical or events that are causally remote, common, and not usually vaccine-related. *Gramling v. Secretary of HHS,* No. 90–696V [1991 WL 137314] (Cl.Ct.Spec.Mstr. July 10, 1991).

Dec. at 4.

HHS contends that the special master should not have held that petitioners only have the burden of proving that a sequela such as death *could have* resulted from a Table injury, but instead that this petitioner's Table injury indeed did cause this petitioner's sequela (*i.e.,* death). In other words, the Government would have Mr. and Mrs. Hossack prove that their son's death was caused in fact by the HHE/shock collapse.[8]

The facts that the Hossack's present greatly resemble those found in two other cases which this Court has already encountered. In both *Zinko v. Secretary of Dep't of Health & Human Servs.,* 24 Cl.Ct. 430 (1991), *appeal dismissed,* 960 F.2d 154 (Fed.Cir.1992), and *Allen v. Secretary of Dep't of Health & Human Servs.,* 24 Cl.Ct. 295 (1991), the victims experienced an HHE/shock collapse within 72 hours after receiving a DPT injection and quickly died, just as Jeffrey Hossack did. In each case, the special master found not only the existence of the Table injury but also that death followed as a sequela thereof, and in both cases, the United States Court of

---

**8.** The Court in *Abbott,* 27 Fed.Cl. at 794, further remarked that the Secretary of Health and Human Services has proposed a rule, although apparently never fully implemented, to require petitioner to prove that an alleged sequela was in fact caused by a Table injury. The proposed rule reads as follows:

"The term 'sequela' means a condition or event which is caused by a condition listed in the Vaccine Injury Table. The petitioner must prove by a preponderance of the evidence that the condition listed in the Vaccine Injury Table is the cause-in-fact of the resulting sequela. The petitioner must prove a logical sequence of cause and effect supported by a generally accepted medical or scientific explanation."

57 Fed.Reg. 36878, 36884 (1992) (to be codified at 42 C.F.R. pt. 100) (proposed Aug. 14 1992).

Federal Claims (or its predecessor [9]) upheld the special masters' decisions.

In *Zinko*, the special master had declared the standard that "for a sequela to be compensable the petitioner had to show by a preponderance of the evidence that the sequela occurred, that the on-Table injury medically *could have* caused the sequela, and that no other known cause of the sequela existed in this particular case." *Zinko*, 24 Cl.Ct. at 431 (emphasis added). The Court agreed, specifying the following standard for proving a compensable sequela:

> If expert medical testimony and other evidence show by a preponderance of the evidence that the Table injury *can* cause a subsequent injury, condition or consequence, the subsequent occurrence can be considered a sequela, and absent evidence sufficient to show another cause, the sequela will be compensated under the Program. To require additional causation determinations would compel requirements contrary to the Program's terms.

*Zinko*, 24 Cl.Ct. at 432 (emphasis added).

Despite this pronouncement, the Court in *Zinko* ultimately did not follow its own standard. Immediately after declaring no need to show direct causation, the Court in *Zinko* contradicted itself by discussing the necessity of at least some evidence showing a credible causal link between the injury and the sequela. For example, the Court agreed that "temporal association alone is insufficient." *Id.* The Court went on to point out that "Zinko's medical expert testified that Zinko suffered an HHE and died *as a result* of the vaccination." *Id.* (emphasis added). The Court in *Zinko*, therefore, actually relied on the fact that some evidence existed to link the injury and the death causally. This reliance was logical, since inherent in the meaning of sequela is the idea that one injury or condition causes another injury or condition.

In *Allen*, this Court rejected the special master's statement that "[s]ince there is no dispute that these events took place within seventy-two hours of the receipt of the vaccine and since there is neither evidence nor indication of an alternative cause within the meaning of the statute, compensability is established." *Allen*, 24 Cl.Ct. at 295. The Court remanded for further clarification, because the notion of sequela implies at least some degree of proof of causation; the Court did not want to compensate simply any and every death which happened to follow a Table injury. *Id.* According to the Court in *Allen*, although a special master may not simply assume a connection between the onset of HHE and death, a special master may conclude, based on some evidence such as expert medical testimony, that more likely than not there is some causal connection between the HHE and death. *Id.* The connection must not be theoretical, but its existence may legitimately be deducted if the special master notes "an observable and relatively uninterrupted progression from vaccination, through HHE, to death." *Id.* at 296.

This Court also addressed the standard for proving a sequela in *Song v. Secretary of Dep't of Health & Human Servs.*, 31 Fed.Cl. 61, *aff'd*, 41 F.3d 1520 (Fed.Cir.1994). In that case, the petitioner alleged that her son Nicholas suffered a presumptively vaccine-related Table injury (residual seizure disorder) within two days of a DPT vaccination and later developed a learning disability. *Id.* at 64. The special master found that although the petitioner had established both a seizure disorder and an encephalopathy, "she failed to establish a causal link between Nicholas's Table injury and his subsequent language deficits." *Id.* at 63–64. Upon the petitioner's motion for review, this Court affirmed the special master, stating:

> Although there is a statutory presumption that the vaccine caused the residual seizure disorder and the encephalopathy, there is no such additional presumption that the residual seizure disorder and the encephalopathy caused Nicholas's learning/speech disability.

*Id.* at 65. To support that ruling, the Court reviewed the legislative history concerning the phrase "[a]ny acute complication or se-

---

**9.** The United States Claims Court was renamed the United States Court of Federal Claims on October 29, 1992. Federal Courts Administra-

tive Act of 1992, Pub.L. No. 102–572, § 902(a), 106 Stat. 4506, 4516.

quela (including death)" found in section 14(a)(I)(E). Interestingly, Congress described the section as follows:

> Each portion of the Table also includes a provision for complications or sequelae of listed injuries which occur within the specified time periods. Thus, for example, if anaphylactic shock occurs within 24 hours of the administration of a DTP vaccine (i.e. within the specified time period), that injury is compensable if other conditions are met. If kidney failure occurs as a complication of that injury, it too is compensable, regardless of when the initial onset of kidney failure occurs.
>
> \* \* \* \* \* \*
>
> [The purpose of section 14(a)(I)(E) is to] emphasize that compensation is available not just for the acute vaccine reaction listed but also for those conditions *which result* from these reactions."

H.R.Rep. No. 908, 99th Cong., 2d Sess. 1, at 19 (1986) (emphasis added), *quoted in Song,* 31 Fed.Cl. at 65 n. 6. Commenting on this passage, this Court went on to declare that although the Table injuries enjoy a presumption that a vaccination caused them when they occur within the particular time period,

> there is no such presumption that the alleged acute complications or sequelae were caused by those specific Table injuries as set forth in § 14(a(I)(E). Indeed, such a presumption would defy logic, law and common sense. \* \* \* Indeed, by their very definition, the terms "complication" and "sequela" require a causal relationship between an earlier event and later events.

*Song,* 31 Fed.Cl. at 66 n. 6.

Based on the above discussion, this Court finds that the Government is correct in its articulation of the appropriate burden in proving a sequela. This Court continues to hold that a petitioner must show that a sequela is caused by a Table injury. This Court finds, along the lines of *Song* and *Allen,* that a preponderance of the evidence must show that some logical, direct causal link exists between the presumed Table injury and the alleged sequela. This is not a difficult burden, and requires far less than medical certainty. Yet, the petitioners in the case at hand must present some evidence, such as expert testimony, fact testimony, or documentation, to convince the special master that, more likely than not, Jeffrey's death was connected to the HHE/shock collapse, which she found had occurred.

## II.

■ Because this Court finds that the special master did not articulate the correct standard, the Court must now decide whether or not to remand the case to the special master. The Government asserts that because the special master set forth an improper standard for determining whether Jeffrey's death was a sequela to the Table injury, she also erroneously failed to address any of the evidence on that issue. The Government, therefore, urges this Court to remand the case to the special master with instructions on the appropriate standard, so that the special master may re-examine the evidence and resolve the factual issues within the new legal framework.

This Court believes, however, that although the special master did articulate an improper legal standard, she nevertheless conducted an appropriate analysis, related her reasons for believing some evidence over other evidence, and issued relevant findings of fact. Far from awarding compensation without examining all of the relevant evidence, the special master carefully weighed each witness' testimony, and elaborated on why she agreed with one expert and not another.

The special master first recognized that death is not compensable in itself, but only as a sequela to some Table injury. Dec. at 3 (citing *Hellebrand,* 999 F.2d at 1570). The special master used the previously mentioned legal definition of sequela found in *Abbott.* Dec. at 4. True, the special master stated that she is only required to find that death "could" result from an HHE/shock collapse. Dec. at 4. Yet she also announced in the same paragraph that she would need more than evidence of a hypothetical nature or of events that are causally remote, common, or not usually vaccine-related to link the death to the Table injury. *Id.* This language demonstrates that the special master did address

the notion of some logical causal evidentiary connection between the HHE and the death.

This becomes even more obvious when one observes the detail with which the special master addressed the expert testimony upon which she relied. Petitioner's expert witness, Doctor Geraghty, testified that Jeffrey *died* as a result of an HHE/shock collapse. Dec. at 7, citing Tr. at 132, 139. In her decision, the special master took pains to explain why she granted greater weight to his testimony than to others' testimony. Although she gave due consideration to each witness, the special master found Doctor Geraghty the most believable and helpful in explaining the total constellation of symptoms. The special master was simply not convinced by the Government's expert, Doctor Gale, that Jeffrey's condition was within the normal range of reactions to DPT vaccinations. Doctor Geraghty's testimony was sufficient to prove, if believed by the special master, that the Table injury caused Jeffrey's death. The special master also specifically found "there was a fundamentally downward trend in Jeffrey's condition from shortly after his vaccination to the time of his death less than 24 hours later." Dec. at 9. This language parallels that found in *Allen,* 24 Cl.Ct. at 296, that holds "an observable and relatively uninterrupted progression from vaccination, through HHE, to death" is enough to allow the awarding of compensation.

In the end, this analysis led the special master to conclude that more likely than not, Jeffrey's death was caused by his HHE/shock collapse. As stated in her specific findings, Dec. at 10, she found by a preponderance of the evidence both that Jeffrey Hossack suffered a Table injury within the relevant time frame *and* that his death was a sequela thereof. Therefore, despite her annunciation of an incorrect standard at the beginning of her decision, the special master's analysis of the evidence brought to light the requisite direct causal link and, based on that, caused her to conclude that "there was a preponderance of the evidence that Jeffrey's death was a sequela of the DPT vaccine-related HHE/shock collapse." Dec. at 10. This Court finds that the special master

conducted an appropriate analysis of all the evidence, an analysis which was not arbitrary or capricious. This Court, therefore, finds no need to remand the case to the special master for further evaluation, since the decision was not arbitrary or capricious, or otherwise not in accordance with the law.

### CONCLUSION

For the reasons set forth above, the Court affirms the special master's memorandum decision dated August 18, 1994. The Clerk of the Court is directed to enter judgment accordingly.